NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| Kenneth M. MEISELMAN, Brian ROTHMAN, Greg SILVERSHEIN, Larry WYMAN, Sheryl WYMAN, Joseph C. CUTTONE, Robert MILANESE, Lawrence A. Cohen, and Judith COHEN,<br><br>Plaintiffs,<br><br>v.<br><br>HAMILTON FARM GOLF CLUB LLC, and HF BUSINESS TRUST,<br><br>Defendants. | Civil No. 11-0653 (AET)<br><br>**OPINION** |

THOMPSON, U.S.D.J.

## I.  INTRODUCTION

This matter has come before the Court upon the Motion to Dismiss filed by Defendants Hamilton Farm Golf Club, LLC ("HFGC") and HF Business Trust ("HFBT") [docket # 16]. Plaintiffs oppose the motion [25]. The Court has decided the motion upon the submissions of the parties and without oral argument, pursuant to Fed. R. Civ. P. 78(b). For the reasons stated below, the Defendants' motion is granted in part and denied in part, and Plaintiffs' breach of contract claim is dismissed.

## II. BACKGROUND[1]

This case arises out of Defendant Hamilton Farm Golf Club, LLC's ("HFGC" or the "Club") refusal to refund Plaintiffs' membership deposits after Plaintiffs' resignation from

---

[1] The facts provided in this section are drawn from allegations in Plaintiff's Amended Complaint, the exhibits attached to the Amended Complaint, and documents that form the basis of Plaintiffs' claims, including the standard Membership Agreement signed by all of the Plaintiffs. *See Lum v. Bank of Am.*, 361 F.3d 217, 222 n.3 (3d Cir. 2004) (stating that courts deciding Rule 12(b)(6) motions to dismiss may consider "allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim.").

Defendant's golf club. Between May 2002 and December 2003, Plaintiffs each paid total deposits in the range of $200,000 to $275,000 in order to obtain an Individual Golf Membership ("IGM") or to upgrade to a Family Golf Membership ("FGM").[2] At the time Plaintiffs joined the club, the Club had distributed to the Plaintiffs a Hamilton Farm Golf Club Membership Plan (the "Plan"). (*See* Am. Compl. ¶ 20); (*id.* Ex. B, Plan). Additionally, upon joining the club, all Plaintiffs signed substantially similar Membership Agreements ("MA"), whereby they agreed to be bound by the Plan. (Mem. in Supp. 4); (*see also* Christopher Tomlin Certification Ex. 3, Silvershein MA, at 2).[3]

The Plan mentions four categories of membership: IGMs, FGMs, Cottage Memberships, and Founder Memberships. (Plan 2–3.) The Plan provides that a combined total of no more than 350 IGMs and FGMs will be issued. (Am. Compl. ¶ 22.); (Plan 4). The Plan and the MA state that resigning members may have their deposits refunded after thirty years. (Plan 5); (Silvershein MA, at 2). These documents also state that a member who resigns before the thirty-year period lapses may have his or her deposit refunded "within thirty days of the issuance of the membership by the Club to a new member." (Plan 6); (Silvershein MA 2). The Plan specifically explains that resigned memberships are placed on a waiting list, and one in four memberships issued prior to the exhaustion of all 350 memberships will come from that waiting list.[4] (Plan 6.) Additionally,

---

[2] Plaintiff Joseph C. Cuttone joined the club in May 2002 upon paying a membership deposit of $200,000 for an Individual Golf Club Membership ("IGM"). (Am. Compl. ¶ 29.) Plaintiff Greg Silvershein signed up for an IGM in August 2002, paying a $200,000 deposit. (*Id.* at ¶ 28.) Plaintiff Larry Wyman also signed up for an IGM in August 2002 for an initial deposit of $200,000. (*Id.* at ¶ 31.) He subsequently upgraded to a Family Golf Membership ("FGM") in April 2006 for an additional deposit of $50,000 in order to obtain membership privileges for his wife Sheryl, also a Plaintiff in this action. (*Id.*) Plaintiff Robert Milanese obtained an IGM in August 2002 for a $204,800 deposit. Plaintiff Brian Rothman paid $200,000 for an IGM in March 2003. (*Id.* at ¶ 30.) Plaintiff Lawrence A. Cohen paid $225,000 for an IGM in October 2003, and upgraded to an FGM in May 2005 for an additional $50,000 in order to obtain privileges for Plaintiff Judith Cohen. (*Id.* at ¶ 32.) Plaintiff Kenneth M. Meiselman paid $202,500 for an IGM in December 2003. (*Id.* at ¶ 26.)

[3] Plaintiffs' Amended Complaint also refers to a Frequently Asked Questions brochure ("FAQ") allegedly distributed by the Defendants, containing largely the same content as the Plan. *See* (Am. Compl. ¶ 20); (*id.* Ex. A). The MA does not bind either party to the FAQ, so absent any indication that the FAQ has the force of contract, we solely address the provisions of the Plan and the MA.

[4] The Plan also provides that after all 350 memberships have been sold, "each Family or Individual Golf Membership issued will be a resigned membership from the waiting list." (Plan 6.) To date, however, the Club has not sold all 350 IGMs and FGMs, (Mem. in Supp. 8), so this provision is not applicable here.

the Plan provides a "downgrade" option whereby a resigned FGM member at the top of the list may opt to receive a prospective IGM member's deposit; conversely, a resigned IGM member at the top of the list will receive a refund from a prospective FGM member's deposit "provided the Club is then issuing new [FGMs]." (*Id.* at 6–7.)

The MA signed by each of the Plaintiffs upon joining the Club states: "The Member hereby acknowledges receipt of the Hamilton Farm Golf Club Membership Plan and Rules and Regulations and that the Member has read and understands them, and agrees to be bound by the terms and conditions thereof as the same may be amended from time to time by the Club." (Silvershein MA 3.) The MA also provides that memberships will be reissued by the Club to new members "in accordance with the reissuance provisions of the Membership Plan . . . ." (*Id.* at 2.) Finally, the MA includes a section entitled "Acknowledgment of Membership Rights," which states in part:

> The Club reserves the right to modify the Membership Plan Documents in its sole discretion to reserve memberships, to sell, lease or otherwise dispose of the Club Facilities in any manner whatsoever and to any person whomever, subject to the right of first offer provided to the members in the Membership Plan, to add, issue or modify any type or category of membership, to recall any membership or membership or memberships at any time for any reason or no reason whatsoever, to convert the Club into a member-owned club, and to make any other changes in the terms and conditions of membership or in the Club Facilities available for use by members. . . .

(Silvershein MA 2.)

All of the Plaintiffs have resigned their memberships at various times since 2006 and have accordingly been placed on the waiting list. Defendants have since issued New Golf Memberships ("NGM") not previously described in the Plan or any other documents given to the Plaintiffs when they joined the club. (Am. Compl. ¶ 39.) Although these NGMS require lower membership deposits—namely, $50,000 up front and $50,000 eight years later—they allegedly include member privileges identical to those offered under FGMs and IGMs. (*Id.* at ¶ 40.) Plaintiffs have demanded that refunds be issued out of the sales of every fourth NGM sold by the

Club, but the Club has refused.  (*Id.* at ¶ 42.)

Defendants assert that refunds have not been paid because new members have not signed up for a traditional FGM or IGM.  (Mem. in Supp. 8.)  The Defendants attribute this to the opening of several other golf clubs in the Somerset County region before the recent economic collapse, as well as the diminished demand for high-end golf club memberships after the collapse.  (*Id.* at 7.)  Plaintiffs, perhaps rightly, point out that the NGMs have rendered FGMs and IGMs unsalable, given that no prospective member would choose a more expensive membership with privileges identical to those offered under the cheaper alternative.  (Br. in Opp'n.)

Plaintiffs filed their initial complaint in New Jersey Superior Court on December 10, 2010.  (*See generally* Notice of Removal Ex. 1, Compl.)  On February 4, 2011, Defendant HFGC properly removed the action to this Court based on diversity jurisdiction [1].  Plaintiffs subsequently filed an Amended Complaint on March 10, 2011 [12].  The Complaint alleges that HFGC committed a breach of contract and a breach of the implied covenant of good faith and fair dealing, and that HFGC's mortgage agreement with HF Business Trust ("HFBT") constituted a fraudulent conveyance.  (*See* Am. Compl. ¶¶ 38–64) [6-1].

### III. ANALYSIS

**A.  Legal Standard for Motion to Dismiss**

Under Fed. R. Civ. P. 12(b)(6), the defendant bears the burden of showing that no claim has been presented. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005).  A district court must accept as true all of a plaintiff's factual allegations, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief. *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008). To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim that is facially plausible. *Gelman v. State Farm Mut. Auto. Ins. Co.*, 583 F.3d 187, 190 (3d

Cir. 2009) (citing *Ashcroft v. Iqbal*, --- U.S. ---, 129 S.Ct. 1937, 1949 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). Facial plausibility exists where the facts pled allow the court reasonably to infer that "the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 129 S. Ct. at 193). Facts suggesting the "mere possibility of misconduct" fail to show that the plaintiff is entitled to relief. *Id.* (quoting *Iqbal*, 129 S. Ct. at 195).

### B. Collateral Estoppel

Plaintiffs argue that Defendants are collaterally estopped from raising their arguments regarding the breach of contract claim because this Court previously allowed similar breach of contract claims to go forward in the actions brought against HFGC by John Bava and Joseph Matina. *See Bava v. Hamilton Farm Golf Club, et al.*, Civ. No. 08-5473; *Matina v. Hamilton Farm Golf Club, et al.*, Civ. No. 08-5725.[5]

Courts typically require the presence of four elements in order to apply collateral estoppel: "(1) the identical issue was previously adjudicated; (2) the issue was actually litigated; (3) the previous determination was necessary to the decision; and (4) the party being precluded from relitigating the issue was fully represented in the prior action." *Howard Hess Dental Labs, Inc. v. Dentsply Int'l, Inc.*, 602 F.3d 237, 247 (3d Cir. 2010) (citation omitted). A collateral estoppel argument is best characterized as "non-mutual offensive collateral estoppel" where "a plaintiff seeks to foreclose a defendant from relitigating an issue the defendant previously litigated unsuccessfully in an action with another party." *Parklane Hosiery Co., Inc. v. Shore*, 439 U.S. 322, 330–31 (1979). The Supreme Court has held that non-mutual offensive collateral estoppel "presents a unique potential for unfairness[,]" and does not promote judicial economy like defensive collateral estoppel because a plaintiff can "adopt a 'wait and see' attitude, in the hope that the first action by another plaintiff will result in a favorable judgment." *Id.* at 329–30. Accordingly, district courts have "broad discretion to determine when to apply non-mutual

---

[5] The *Bava* and *Matina* cases ultimately settled on April 7, 2010.

offensive collateral estoppel," *Jean Alexander Cosmetics, Inc. v. L'Oreal USA, Inc.*, 458 F.3d 244, 248 (3d Cir. 2006) (citing *Parklane*, 439 U.S. at 330, 331), and may apply "'an overriding fairness determination,'" *Hall v. AT&T Mobility LLC*, 608 F. Supp. 2d 592, 600 (D.N.J. 2009) (citing *Burlington N. R.R. Co. v. Hyundai Merch. Marine Co., Ltd.*, 63 F.3d 1227, 1232 (3d Cir. 1995)).

Here, because Plaintiffs were not parties to the previous lawsuits and because they seek to prevent Defendants from arguing for dismissal of the breach of contract claim, Plaintiffs' argument is best characterized as non-mutual offensive collateral estoppel, and the Court therefore has broad discretion. We find that at least four reasons weigh against applying collateral estoppel. First, the previous determination in the *Bava / Matina* consolidated action was a denial of a motion to dismiss the plaintiffs' breach of contract claim. In denying that motion, the Court stated:

> I've seen your papers . . . and it seems to me that you may have a legitimate and substantive breach of contract claim. I don't know. And I think that discovery should be granted so that you can go ahead and find out whatever you need to know about the qualifications or conditions which would allow for the return of your deposit money. Maybe it will be there, maybe it won't.

(Bruce A. Schoenberg Decl. Ex. 4, June 22, 2009 Hr'g Tr. 42). The denial of the motion to dismiss was clearly expressed as a tentative ruling in order to allow discovery to go forward, and did not have the trappings of finality regarding whether Plaintiffs' claims were meritorious. *See Kay-R Ele. Corp. v. Stone & Webster Const. Co., Inc.*, 23 F.3d 55, 59 (2d Cir. 1994) (stating that "preclusion would be folly[] as to decisions that are merely tentative and contemplate further proceedings") (quoting Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Fed. Prac. & Proc. § 4432 at 299 (1981))). Second, although the Third Circuit does not appear to have addressed the present procedural posture, other Circuits have held that collateral estoppel need not be applied where a court has denied a motion to dismiss and left the issue to be decided at a later stage. *See, e.g., Drake v. Whaley*, 355 F. App'x 315, 317 (11th Cir. 2009) (finding that district

court did not err by not applying collateral estoppel to claim on which another court had denied a motion to dismiss). Third, the Amended Complaint here differs in significant respects from the complaints in *Bava* and *Matina*: in this case, the breach of contract claim is more specific, and the breach of implied covenant of good faith and fair dealing claim more concretely describes the NGMs. Finally, we note our concern that the Plaintiffs in this action might have chosen to opportunistically "wait and see" what the outcome of other disputes against Defendant HFGC would be.

Thus, we will not apply non-mutual offensive collateral estoppel in this case.

### C. Breach of Contract

Plaintiffs allege that Defendant HFGC committed a breach of contract in the following ways: (1) issuing new categories of membership not provided for in the Membership Plan, (Am. Compl. ¶ 44); (2) not using the proceeds of every fourth NGM to refund the deposits of resigned IGMs or FGMs, (*id.* at ¶ 45); (3) not offering resigned IGM and FGM members the opportunity to "downgrade" and thereby exchange their resigned memberships for the deposit paid for every fourth NGM, (*id.* at ¶ 46); and (4) preferentially repurchasing IGMs and FGMs from resigned members lower down on the waiting list, including memberships formerly held by John Bava, Joseph Matina, and David Baum, (*id.* at ¶ 47). Because Defendant HFGC was contractually entitled to engage in the alleged conduct, we must dismiss Plaintiffs' breach of contract claim in its entirety.

As to the first allegation, Plaintiffs cannot base a breach of contract claim on Defendant HFGC's issuance of new membership categories, given that Defendant was contractually entitled to do so. The MA provides that "[t]he Club reserves the right to . . . add, issue or modify any type or category of membership . . . ." (Silvershein MA 2.) Because the plain language of the MA allows the Club to add membership categories, we cannot conclude that the Club's decision to issue NGMs constituted a breach. *See Green v. AOL*, 318 F.3d 465, 472 (3d

Cir. 2003) (affirming district court's dismissal of breach of contract claim where "'plain language of the Member Agreement foreclose[d] any claims that AOL breached its obligations.'").

The second allegation—that Defendant HFGC breached by not using every fourth NGM to refund Plaintiffs' IGM or FGM deposits—must fail because neither the MA nor the Plan provides any such obligation. The Plan describes the reissuance procedure solely in terms of FGMs and IGMS. (*See* Plan 6–7.) We recognize that the Plan's silence regarding NGMs most likely owes to the fact that NGMs had not been created at that time. However, the Plan's terms also do not suggest that the refund of FGMs and IGMs deposits may come from the issuance of any other membership type, such as Cottage Memberships. Thus, the Club's failure to use NGM deposits to refund IGM or FGM deposits is not a breach of contract because the Plan did not contractually obligate the Club to do so.

Plaintiffs' third allegation fails for largely the same reason. The Plan describes the "downgrade" option solely in terms of IGMs and FGMs. (*See* Plan 4 ("An [IGM member] may upgrade to a [FGM] by paying the difference between the membership deposit for the [FGM] then in effect and the membership deposit paid by the member for the [IGM]. A [FGM member] may downgrade to an [IGM].").) Likewise, the Plan's "Transfer of Membership" procedures state only that an FGM member at the top of the waiting list may choose to accept the deposit proceeds of an incoming IGM, and that an IGM member at the top of the waiting list will receive an incoming FGM member's deposit if FGMs are being issued. (*Id.* at 6–7.) The Plan does not allow FGMs and IGMs to downgrade or upgrade to membership types other than IGMs or FGMs. Thus, the Club did not commit a breach, given that it was not contractually obligated to allow IGM and FGM members at the top of the waiting list to "downgrade" and exchange their resigned memberships for every fourth NGM.

Plaintiffs' fourth allegation—that Defendant HFGC preferentially repurchased certain IGMs and FGMs from resigned members not according to the waiting list procedure specified in

the Plan—also fails to state a breach of contract claim.  The Plan states that "[r]esigned [FGMs] and [IGMs] will be placed on a waiting list and will be reissued on a first-resigned, first-reissued basis."  (Plan 6.)  This provision designates the order in which memberships will be reissued.  However, the Plan also states: "The Club may, in its sole and absolute discretion, but is not obligated to, repurchase a resigned membership on any terms which are mutually agreeable to the Club and the resigned member. . . ."  (*Id.* at 8.)  So, although the Club must follow the prescribed order in *reissuing* memberships, it may *repurchase* memberships at its discretion.  This distinction is important because Plaintiffs have alleged the Club breached not by reissuing but by "preferentially repurchasing certain [IGMs] and [FGMs] from resigned members lower down on the list of resigned members than Plaintiffs."  (Am. Compl. ¶ 47.)  Because Defendant HFGC had absolute discretion to repurchase these memberships, it did not commit a breach.

Thus, we must dismiss Plaintiffs' breach of contract claim in its entirety.

### D.  Breach of Covenant of the Implied Good Faith and Fair Dealing

Plaintiffs allege that, even if Defendant HFGC was not contractually prohibited from creating new membership classes, Defendant breached the covenant of good faith and fair dealing by creating NGMs to avoid having to refund resigned IGM and FGM deposits.  (Am. Compl. ¶ 52.)[6]  We find that Plaintiffs have adequately stated this claim and therefore deny the motion to dismiss.

Under New Jersey law, "[e]very party to a contract . . . is bound by a duty of good faith and fair dealing in both the performance and enforcement of the contract."  *Elliott & Frantz, Inc. v. Ingersoll-Rand Co.*, 457 F.3d 312, 328 (3d Cir. 2006).  A party breaches the duty of good faith and fair dealing "if that party exercises its discretionary authority arbitrarily, unreasonably, or

---

[6]  Defendants ask us to "reaffirm [our] earlier precedent" in the *Bava* and *Matina* cases, in which we dismissed the plaintiffs' claim alleging breach of the implied covenant of good faith and fair dealing.  (Reply Mem. 7.)  However, we decline to treat *Bava* and *Matina* as precedential, particularly considering the significant differences between the complaints in those cases and the Amended Complaint in this case.

capriciously, with the objective of preventing the other party from receiving its reasonably expected fruits under the contract." *Slack v. Suburban Propane Partners, L.P.*, No. 10-2548, 2011 WL 666042, at *3 (D.N.J. Feb. 14, 2011) (quoting *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1130 (N.J. 2001)). Stated differently, "'[a] party to a contract breaches the covenant if it acts in bad faith or engages in some other form of inequitable conduct in the performance of a contractual obligation.'" *Metex Mfg. Corp. v. Manson*, No. 05-2948, 2008 WL 877870, at *7 (D.N.J. Mar. 28, 2008) (quoting *Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.*, 228 F.3d 275, 288 (3d Cir. 2000)). "Bad motive or intention is essential" to a court's consideration of this claim. *Wilson*, 773 A.2d at 1130.

Here, Plaintiffs have sufficiently alleged that Defendant HFGC breached the implied covenant of good faith and fair dealing. Specifically, Plaintiffs allege that Defendant HFGC created NGMs "having substantially the same rights and privileges as [IGMs] and FGMs . . . for the sole purpose of avoiding its continuing obligation to use the proceeds of the sale of every fourth membership to refund the membership deposits of resigned [IGMs] and [FGMs]." (Am. Compl. ¶ 52.) True, the Club was contractually authorized to add new membership categories. (*See* Silvershein MA 2.) But for the Club to create a new membership category nearly identical to IGMs and FGMs in all respects except for price is unsettling, particularly in light of the various inducements in the Plan suggesting that resigned memberships would be reissued as new members joined. *See e.g.* (Plan i ("**Refundable Membership Deposit**. The membership deposit paid for a membership is refundable upon resignation and reissuance of the membership, or in 30 years from admission to the Club, whichever is the sooner to occur.") (emphasis in original)); (*id.* ("**Resigned Memberships Reissued Prior to Membership Sell-Out.** Resigned members do not have to wait until all new memberships in the Club have been issued before their resigned membership is reissued.") (emphasis in original)). Defendants may ultimately be able to show through discovery that there were reasonable, good faith reasons for creating this new

membership category, or that NGMs are not in fact substantially the same as IGMs or FGMs. At this stage, however, we must deny the motion to dismiss. *See Slack*, 2011 WL 666042, at *3 (citing *Wilson*, 773 A.2d at 1130) (stating that plaintiff pursuing claim for breach of implied covenant of good faith and fair dealing "must be given a full opportunity to show a defendant's bad motive")).

### E. Fraudulent Conveyance

Plaintiffs claim Defendant HFGC's mortgage agreement with Defendant HFBT amounted to a fraudulent conveyance under the Uniform Fraudulent Transfer Act ("UFTA"), N.J.S.A. § 25:2-1, *et seq.* (Am. Compl. ¶ 57–63.) Applying New Jersey's UFTA, we will deny Defendants' motion to dismiss.

#### 1. Applicable Law: New Jersey's UFTA

We first address Defendants' choice-of-law argument: namely, that Plaintiffs' UFTA claim should be dismissed because the Court must apply Maryland's Uniform Fraudulent Conveyance Act ("UFCA") rather than the UFTA. (Mem. in Supp. 14–23.) A federal court sitting in diversity applies the choice-of-law principles of the forum state. *Woessner v. Air Liquide Inc.*, 242 F.3d 469, 472 (3d Cir. 2001) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487 (1941)). Accordingly, we apply the choice-of-law principles of New Jersey, which employs the "most significant relationship" test set forth in the Restatement (Second) of Conflict of Laws (the "Restatement"). *P.V. ex rel T.V. v. Camp Jaycee*, 962 A.2d 453, 460 (N.J. 2008). Under this test, a court must determine: (1) "whether an actual conflict in law exists[;]" and if so, (2) "which jurisdiction has the 'most significant relationship' to the claim" according to the Restatement factors. *Grossbaum v. Genesis Genetics Inst.*, No. 07-1359, 2011 WL 2462279, at *3 (D.N.J. June 10, 2011) (citing *Camp Jaycee*, 962 A.2d at 460–61). Section 6 of the Restatement provides the following factors:

> (a) the needs of the interstate and international systems, the relevant policies of the

> forum, (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue, (d) the protection of justified expectations, (e) the basic policies underlying the particular field of law, (f) certainty, predictability, and uniformity of result, and (g) ease in the determination and application of the law to be applied.

Restatement § 6. Section 145 of the Restatement further provides a list of contacts to be taken into account in applying § 6, including:

> (a) the place where the injury occurred, (b) the place where the conduct causing the injury occurred, (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and (d) the place where the relationship, if any, between the parties is centered.

Restatement § 145.

The parties agree that a conflict exists between New Jersey's UFTA and Maryland's UFCA. (*See* Reply Mem. 8.) The policy underlying fraudulent transfer law in both New Jersey and Maryland is to protect creditors against a debtor's attempts to place his or her property out of reach. *See Gilchinsky v. Nat'l Westminster Bank of N.J.*, 732 A.2d 482, 488 (N.J. 1999) (stating that purpose of New Jersey's UFTA is "to prevent a debtor from placing his or her property beyond a creditor's reach"); *Damazo v. Wahby*, 305 A.2d 138, 142 (Md. 1973) ("'[T]he underlying objective of the uniform act . . . is to enhance and not impair the remedies of the creditor.'" (alterations in original) (citation omitted)). The putative creditors—here, the Plaintiffs—are predominantly New Jersey residents,[7] so New Jersey has a strong interest in protecting these creditors in light of its fraudulent transfer policy. Furthermore, HFGC's place of business is in New Jersey, the golf club property is in New Jersey, and the relationship between the Plaintiffs and the Defendants is centered in New Jersey. Thus, New Jersey has the most significant relationship to the claim, and we will apply New Jersey's UFTA.

In considering Plaintiffs' UFTA claims, we will apply the heightened pleading standard of Rule 9(b). *See Ford Motor Credit Co. v. Chiorazzo*, 529 F. Supp. 2d 535, 538 (D.N.J. 2008); Fed.

---

[7] Specifically, Meiselman, Rothman, Silvershein, Cuttone, and Milanese are all New Jersey citizens; the Wymans are citizens of Florida; and the Cohens are citizens of Utah. (Am. Compl. ¶¶ 2–8.)

R. Civ. P. 9(b) (stating that pleading "must state with particularity the circumstances constituting fraud or mistake[,]" although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

### 2. Plaintiffs' UFTA Claim Under § 25:2-25

Plaintiff brings a fraudulent transfer claim under N.J.S.A. § 25:2-25 of New Jersey's UFTA, which provides:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation:
> a) With actual intent to hinder, delay, or defraud any creditor of the debtor; or
> b) Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
> > (1) Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
> > (2) Intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they become due.

N.J.S.A. § 25:2-25. To determine whether there was an actual intent to defraud, courts must consider the presence of the "badges of fraud" factors listed in the statute under N.J.S.A. § 25:2-26. *See Truong v. Kartzman*, No. 06-5511, 2007 WL 1959259, at *4 (D.N.J. July 5, 2007); *In re Norvergence, Inc.*, 405 B.R. 709, 732 (Bankr. D.N.J. 2009). These factors include:

> a) the transfer or obligation was to an insider;
> b) the debtor retained possession or control of the property transferred after the transfer;
> c) the transfer or obligation was disclosed or concealed;
> d) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
> e) the transfer was of substantially all the debtor's assets;
> f) the debtor absconded;
> g) the debtor removed or concealed assets;
> h) the value of the consideration received by the debtor was not reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;
> i) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
> j) the transfer occurred shortly before or after a substantial debt was incurred; and

> k) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

N.J.S.A. § 25:2-26.  A finding of one badge of fraud may "cast suspicion on the transferor's intent," and a finding of "several in one transaction generally provides conclusive evidence of an actual intent to defraud."  *In re Global Outreach, S.A.*, No. 11-0620, 2011 WL 2294168, at *5 (D.N.J. June 6, 2011) (quoting *Gilchinsky*, 732 A.2d at 490.)  "The proper inquiry is whether the badges of fraud are present, not whether some factors are absent."  *Id.* (quoting *Gilchinsky*, 732 A.2d at 489–90).

Plaintiffs' Amended Complaint alleges, "The Mortgage was a fraudulent transfer as to Plaintiffs pursuant to N.J.S.A. 25:2-25(a) because such transfer 'was made with the actual intent to hinder, delay or defraud any creditor of the debtor.'"  (Am. Compl. ¶ 62.)  Defendants assert that Plaintiffs have failed to provide any particulars and have merely recited the statutory language.  (Mem. in Supp. 28–29.)  We disagree.

Although the allegation excerpted above merely recites the statutory language, other paragraphs within Plaintiffs' Fraudulent Conveyance count sufficiently allege badges of fraud.  Specifically, Plaintiffs allege that the obligation was granted to an insider, (Am. Compl. ¶ 58 (stating that "HF Business Trust and HFGC are under common ownership and control of an 'insider' of HFGC")); that the security interest was for all of the debtor's assets, (*id.* ¶ 59 (stating that "HFGC granted HF Business Trust a security interest in all of HFGC's assets, including the Club (the 'Property')"); and that the debtor was insolvent, (*id.* at ¶ 60 (stating that "at the time Defendant HFGC entered into the Mortgage with Defendant HF Business Trust, Defendant HFGC was 'insolvent' as that term is defined by N.J.S.A. 25:2-23 in that (a) the sum of Defendant HFGC's debts was greater than all of HFGC's assets, at a fair valuation; and (b) HFGC was generally not paying its debts as they became due")).  These badges of fraud provide adequate support for Plaintiffs' § 25:2-25(a) actual fraud claim.

Accordingly, the Court will decline to dismiss Plaintiffs' § 25:2-25(a) claim.

### 3. Plaintiffs' UFTA Claim Under § 25:2-27

Plaintiff also brings a claim under N.J.S.A. § 25:2-27 of the UFTA, which states:

> a) A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.
> b) A transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made if the transfer was made to an insider for an antecedent debt, the debtor was insolvent at that time, and the insider had reasonable cause to believe that the debtor was insolvent.

N.J.S.A. § 25:2-27. As an initial matter, we reject Defendants' argument that Plaintiffs are not "present creditors," (*see* Mem. in Supp. 23). Under the UFTA, a "creditor" is a person who has a "claim," which is defined as "a right to payment, whether or not the right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." N.J.S.A. 25:2-21. Defendants assert that Plaintiffs are not present creditors because their right to a refund vests in thirty years. (*See* Reply Mem. 13.) However, the UFTA protects creditors with "unmatured" claims, so Plaintiffs qualify as "creditors" even without an immediate right to payment. Moreover, the Plaintiffs all contracted for the right to a future refund when they joined the Club in 2002 or 2003, so Plaintiffs' claims "arose before" the Club incurred the mortgage obligation, as required by § 25:2-27.[8] Accordingly, the Court proceeds to the other elements of this claim.

As to Plaintiffs' § 25:2-27(a) claim, Defendants argue that HFGC incurred the mortgage obligation for "reasonably equivalent value," given that "the Consolidated Note is structured to

---

[8] We also note that the grant of a security interest through a mortgage is a "lien" and therefore constitutes a "transfer" under the UFTA. See N.J.S.A. § 25:2-22 ("'Transfer' means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with an asset or an interest in an asset, and includes payment of money, release, lease, and *creation of a lien* or other encumbrance." (emphasis added)); *id.* ("'Lien' means a charge against or an interest in property to secure payment of a debt or performance of an obligation, and includes a *security interest created by agreement* . . . ." (emphasis added)).

-15-

equal ***exactly*** the amounts of antecedent debt and additional present value advanced" under the Mortgage. (Mem. in Supp. 26 (emphasis in original).) New Jersey law does not provide a universal definition of "reasonably equivalent value," *cf.* N.J.S.A. § 25:2-24(b), but the Third Circuit has adopted, in the absence of a New Jersey Supreme Court ruling on point, a "'common sense'" approach based on the totality of the circumstances. *VFP LLC v. Campbell Soup Co.*, 482 F.3d 624, 631 (3d Cir. 2007) (quoting *In re Fruehauf Trailer Corp.*, 444 F.3d 203, 214 (3d Cir. 2006); *see also Highlands Ins. Co. v. Hobbs Grp., LLC*, 373 F.3d 347, 351 (3d Cir. 2004) ("[W]here the state's highest court has not spoken definitively on a particular issue, the federal court must make an informed prediction as to how the highest state court would decide the issue."). Here, the security interest appears to have been given for reasonably equivalent value, considering the principal and interest of the promissory notes totaled $46,671,904, and HFGC obligated itself to repay HFBT up to $50 million "or so much thereof as shall have been advanced hereunder and remains outstanding." (Tomlin Certification Ex. 10, at 1–2.) Accordingly, we will dismiss Plaintiffs' § 25:2-27(a) claim.

However, we find that Plaintiff has adequately stated a claim under § 25:2-27(b). Plaintiffs have alleged that HFBT and HFGC are "under common ownership and control of an 'insider' of HFGC," (Am. Compl. ¶ 58.); that "at the time Defendant HFGC entered into the Mortgage with Defendant [HFBT], Defendant HFGC was 'insolvent[,]'" (*id.* at ¶ 60.); that "'the transfer was made to [HF Business Trust] for an antecedent debt,'" (*id.* at ¶ 63 (alterations in original); and that "'[HF Business Trust] had reasonable cause to believe that [HFGC] was insolvent[,]'" (*id.*). Indeed, Defendants concede that the "Consolidated Note restated and incorporated $46,671,904 in antecedent debts." (Mem. in Supp. 27.) Moreover, the Notice of Removal indicates that the members of the HFGC limited liability company are the same individuals who are the beneficiaries of HFBT and who also comprise the company that serves as HFBT's trustee. (Notice of Removal ¶ 7.) It would follow as a matter of course that these

individuals would have reasonable cause to believe HFGC was insolvent if HFGC really was insolvent.  Thus, Plaintiffs have adequately pleaded the requisite elements of a § 27(b) claim.

Defendants argue that Plaintiffs' § 27(b) claim should nonetheless be dismissed based on the safe harbor provision stating that transfers to insiders are not voidable under § 25:2-27 if they are "made pursuant to a good-faith effort to rehabilitate the debtor and the transfer secured present value given for that purpose as well as an antecedent debt of the debtor."  (Mem. in Supp. 26–27 (quoting N.J.S.A. § 25:2-30(f)(3).)  However, good faith is an affirmative defense on which Defendants bear the burden of proof.  *Sun Nat'l Bank v. Visci*, No. L-2215-09, 2011 WL 2410238, at *6, 7 (N.J. Super. Ct. App. Div. June 8, 2011).  Aside from merely presenting the Consolidated Note and related documents, Defendants ask this Court to take "judicial notice" of HFGC's continued operation and "matters of public knowledge," (Mem. in Supp. 27–28 (citing http://www.hamiltonfarmgolfclub.com).  These vague assertions fail to discharge Defendants' burden at this stage.

Thus, we decline to dismiss Plaintiffs' § 25:2-27(b) claim.

## IV. CONCLUSION

For the reasons stated above, and for good cause shown, we will dismiss Plaintiffs' breach of contract claim.  An appropriate order will follow.

                                                 */s/ Anne E. Thompson*
                                                ANNE E. THOMPSON, U.S.D.J.

Dated___August 29, 2011_____